JAMES CRAWLEY, Plaintiff in Error,

*v.*

STATE OF TENNESSEE, Defendant in Error.

413 S.W. 2d 370.

(*Knoxville,* September Term, 1966.)

Opinion filed March 17, 1967.

T. O. JEWELL, Chattanooga, for plaintiff in error.

GEORGE F. McCANLESS, Attorney General, and EDGAR P. CALHOUN, Assistant Attorney General, Nashville, for defendant in error; and EDWARD E. DAVIS, District Attorney General, Sixth Judicial Circuit, Chattanooga, prosecuted the case for the State in the trial court.

MR. SPECIAL JUSTICE WILLIAM J. HARBISON delivered the opinion of the Court.

Plaintiff in error was indicted in the Criminal Court of Hamilton County, Tennessee, for involuntary manslaughter caused by alleged willful and wanton operation

of an automobile in connection with an accident which occurred on March 13, 1965. One J. A. Lane was struck by the automobile driven by plaintiff in error and died as a result of injuries received in the accident. The jury found plaintiff in error guilty and he was sentenced to serve eleven months and twenty-nine days in the Hamilton County Workhouse. On this appeal several assignments of error have been made, but the principal assignment and one which we deem controlling, is that the evidence is insufficient to support the verdict of the jury, and that the verdict is contrary to the weight and preponderance of the evidence.

The accident happened on Highway No. 153 in Hamilton County, Tennessee, which is a paved two-lane highway, running generally from the southeast to the northwest. The deceased, J. A. Lane, had been pushing his stalled automobile with a 1952 Ford pickup truck, which he had borrowed from his father. The accident happened at night. It appears from the testimony of the widow of the decedent that Lane's automobile had become stalled on the highway. He had then gone to his father's home and had borrowed the 1952 Ford pickup for the purpose of pushing the car in order to start it, or to move it to a service station. Mrs. Lane and two children of the decedent went with Mr. Lane in the truck to move the car. Mrs. Lane then steered the car while Mr. Lane pushed it with the truck for some distance, but it appeared that the car would not start and the truck itself became stalled behind the car. The couple then pushed the car off the highway, and the truck was left in the highway and it was either entirely on the highway, or at a minimum, was partially blocking the north bound lane of traffic. There were no flares or warning signs around the truck

and no effort was made to flag approaching traffic. The testimony indicates that the headlights were burning, but there is no proof that the taillights were on or that they operated.

Plaintiff in error approached the truck from the rear, and was proceeding in the same direction as Mr. Lane had been traveling prior to the time the truck had stalled. Plaintiff in error, swerving to his left, struck the rear of the truck, and then struck Mr. Lane, who was standing in the highway beside the truck. Plaintiff in error went off the highway to his left, and sustained painful injuries in the accident himself. Mr. Lane was struck by the automobile and died as a result of injuries received in the impact.

Mrs. Lane had seen the automobile of plaintiff in error approaching from the rear, had made some remark to her husband that the car was coming fast, and had undertaken to warn him. She herself jumped upon the running board of the truck and held onto the steering wheel. She lost consciousness in the accident, however, and did not actually see the impact. She said that her husband was standing directly behind her beside the bed of the truck when she last saw him before the accident.

An eyewitness, Bobby Gene Ritchie, was approaching in his automobile from the opposite direction at the time of the accident. He testified that he could see the front lights of the truck burning as he approached, and he could see the automobile of plaintiff in error approaching from the rear of the truck. He, of course, did not know whether the rear lights of the truck were on. He estimated that the parked truck could be seen from three hundred to five hundred yards away in the direction from

which plaintiff in error was traveling. He testified that immediately after the accident he went to the automobile being driven by plaintiff in error and that plaintiff in error made a statement that the truck had no lights on it.

. One of the investigating officers, a member of the Tennessee Highway Patrol, testified that when he got to the scene of the accident there were no lights burning on the truck. The truck, in the impact, had been knocked off the highway and into a ditch. He testified that there were some forty-eight feet of skid marks on the highway leading up to the apparent point of impact. These skid marks were in the right hand lane of traffic for a vehicle proceeding in the direction in which plaintiff in error was driving. The patrolman estimated that a vehicle could be seen from the place where the collision occurred, by a driver coming from the direction in which plaintiff in error was proceeding, for a distance of about one thousand feet. He, of course, had no way of knowing whether the red taillights on the truck had been burning prior to the accident.

The officer testified that he interviewed plaintiff in error in the hospital, and he testified that he "smelled alcohol on him." It appears from the uncontradicted testimony in the record, however, that in the emergency room the face of plaintiff in error had been bathed first with water and then had been treated with alcohol. There is no other testimony in the record suggesting that plaintiff in error had been drinking, and there is nothing in any of the hospital charts or records to indicate that plaintiff in error had alcohol on his breath or was in any way under the influence of alcohol upon his admission to the hospital. There is no such allegation in the indictment. The custodian of the hospital records testi-

fied that the records should have contained a notation to report the presence of alcohol had such been detected on the breath of plaintiff in error, or had he manifested being under the influence.

. Plaintiff in error, testifying in his own behalf, positively denied that he had anything to drink prior to the accident. He testified that he had been at home asleep during the daylight hours. In this he was corroborated by his mother, with whom he made his home, and she testified that he had nothing to drink before leaving the house a short time prior to the accident. Plaintiff in error testified that he did not see the stalled truck in the highway until he was too close to avoid striking it. He then applied his brakes and turned to his left in an effort to avoid the accident. Plaintiff in error testified that his speed prior to the application of his brakes was approximately fifty miles per hour, and there is no other direct evidence in the record as to his speed. The inferences that might be made from the skid marks, physical damage to the vehicles, or positions of the vehicles after the accident are certainly as consistent with the testimony of plaintiff in error as with an inference of reckless or excessive speed.

Plaintiff in error testified that there were no lights burning on the rear of the truck as he approached it. The scene of the accident was on the open highway, outside of any city limits, and the speed limit at night in the area where the accident occurred was fifty-five miles per hour. Plaintiff in error was meeting the automobile of Mr. Ritchie, which had its headlights on, and, of course, under these circumstances plaintiff in error could not tell from the rear whether the truck headlights were or were not burning.

In the impact plaintiff in error sustained a head injury, including a laceration more than six inches long, and it was this laceration which was treated with alcohol in the emergency room of the hospital where he was interviewed by the investigating officer.

 This Court has stated several times that:

Where one unintentionally causes another's death by conduct not amounting to a felony and not malum in se but which constitutes gross and culpable negligence, he is guilty of involuntary manslaughter. * * *

It is true in such cases allowance must be made for misadventure or accident, as distinguished from culpable negligence; and that, to support a conviction of crime, the accused must have been guilty of a higher and grosser degree of negligence than that which merely suffices to support a judgment in a civil case. *Roe v. State,* 210 Tenn. 282, 295, 358 S.W.2d 308 (1962), and cases therein cited.

In the *Roe* case the Court said:

To convict a motorist of homicide by negligence, it is, of course, not enough to prove that he was guilty merely of a want of due care, inadvertence, or inattention, but it must be shown that his negligence in driving was such that he knew or reasonably should have known that it might endanger human life, and that the death charged was the natural and probable result of such negligence. *Roe v. State,* supra, at 295. See also, *Newby v. State,* 215 Tenn. 609, 388 S.W.2d 136 (1965).

 We are of the opinion that the evidence in this case does not meet the requirements laid down by this Court to sustain a conviction for involuntary manslaughter. Certainly the evidence is unconvincing and

insufficient to establish that plaintiff in error had been drinking prior to the accident, or that he was under the influence of alcohol. See *Newby v. State,* supra. The evidence of his speed, apart from his own testimony, is entirely circumstantial, and is certainly not indicative of gross, wanton, or willful misconduct. Plaintiff in error may have been guilty of negligence, but much could be said about the conduct of the decedent himself in leaving the truck in the open highway at night and of standing in the road in the driving lane under the circumstances shown in the record. See *Bradam v. State,* 191 Tenn. 626, 235 S.W.2d 801 (1951).

We are of the opinion that the evidence in this case preponderates against the verdict, and that the cause must be remanded for a new trial.

Since a new trial will be necessary, we deem it appropriate to comment only upon one other assignment of error made before us. This relates to the introduction of testimony that the plaintiff in error declined to submit to a blood alcohol test. During the direct examination of the highway patrolman, who testified to an interview with plaintiff in error at the hospital, and who testified that he smelled alcohol on plaintiff in error, the officer testified that he asked plaintiff in error if he would take a blood test, and that plaintiff in error did not take such a test and did not want to submit to it. Objection to this testimony was overruled.

■ We are of the opinion that this testimony, under the facts and circumstances shown in the record before us, was inadmissible. It is true that by T.C.A. sec. 59-1032 chemical tests of the blood, urine or breath made to show the amount of alcohol in the defendant's blood are made admissible in evidence in criminal prosecutions for driv-

ing while under the influence of an intoxicant. This Court, however, in two recent cases has held that the results of such tests are not automatically admissible, but are admissible only when the tests are shown to have been properly administered by qualified experts, and when it is shown that the testing device is scientifically acceptable and accurate for the purpose thereof. *Fortune v. State,* 197 Tenn. 691, 277 S.W.2d 381 (1955); *Pruitt v. State,* 216 Tenn. 686, 393 S.W.2d 747 (1965). In both cases this Court held that the admission of the results of tests was prejudicial error when the proof failed to establish that the persons giving the tests were properly qualified.

There is nothing in the Tennessee statutes concerning alcohol tests to indicate that the Legislature intended that these tests be compulsory or mandatory. The results of the tests themselves are admissible only under the circumstances outlined in the decisions of this Court above cited. Consequently, we do not deem it proper to permit the State to introduce testimony that the accused declined a general proposal that he take "a blood test for alcohol," under the circumstances shown in this record, where the accused was hospitalized with significant injuries and where there is no showing whatever as to the laboratory or testing devices proposed to be used, or of the competency of the persons proposing to administer such a test.

In 87 A.L.R.2d 371 (1963), there is an extensive annotation on the subject of the admissibility in criminal cases of evidence that an accused refused to submit to scientific tests to determine the amount of alcohol in his system. There is a substantial divergence of judicial opinion on this subject, many of the cases turning upon local statutory provisions. In at least one state a statute makes the

submission to such tests mandatory, as a condition to being licensed to operate a motor vehicle. In other states the statutory provisions make the tests entirely voluntary and contain provisions that failure to submit to the tests shall afford no basis for adverse comment or inference. 87 A.L.R.2d 374-378. As stated, the Tennessee statutes are silent on this subject. Since no actual test was given in the present case, we do not find it necessary to decide whether or not there would be a violation of the constitutional rights of an accused if he were forced involuntarily to take such a test. We do hold, however, that on the record before us the alleged refusal of the accused to take a blood test was not of probative value and should not have been admitted in evidence. See 87 A.L.R.2d 386-389. We accordingly sustain the assignment of error addressed to the admission of this testimony of the highway patrolman under the present record.

The judgment of the trial judge is reversed and the case is remanded for a new trial.

Reversed and remanded.

BURNETT, CHIEF JUSTICE, and DYER, CHATTIN and CRESON, JUSTICES, concur.